IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NICOLE RENEE BENTON, | CASE NO. 4:22-cv-682 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Nicole Benton filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In October 2019, Benton filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of

August 23, 2018,[1] and claiming she was disabled due to congestive heart failure, hypertension, lung issue, lymphedema, morbid obesity, depression, anxiety, and atypical cells in her left breast. Tr. 198, 205, 237. The Social Security Administration denied Benton's applications and her motion for reconsideration. Tr. 99–102. Benton then requested a hearing before an Administrative Law Judge (ALJ). Tr. 145.

In November 2020, an ALJ held a hearing. Benton and a vocational expert testified. Tr. 41-72. In January 2021, the ALJ issued a written decision finding that Benton was not disabled. Tr. 15-36. The ALJ's decision became final on March 3, 2022, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Benton filed this action on April 27, 2022. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ committed harmful error when her RFC failed to consider the effect of the combination of Benton's severe impairments and the related symptoms on her ability to perform her past relevant work and/or to engage in substantial gainful activity on a full-time and sustained basis.

> 2. At Step Four and Step Five of the Sequential Evaluation, the ALJ's RFC finding that Benton did not need to elevate her legs throughout the day, was not supported by substantial evidence when she erroneously

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

found that Benton could still perform her past work as a laboratory clerk or other jobs which existed in the national economy.

Doc. 10, at 1.[2]

**Evidence**

*1.    Personal and vocational evidence*

Benton was born in 1970 and was 47 years old on her alleged disability onset date. Tr. 198. She completed two years of college and used to work as a medical lab report clerk and a nurse's aide. Tr. 50–52, 64.

*2.    Medical evidence[3]*

Benton has a history of congestive heart failure and she saw Bhargava Ravi, M.D., to manage her condition. Tr. 291. Dr. Ravi also diagnosed Benton with morbid obesity and leg edema. Tr. 294. In December 2017, Benton's exam showed that Benton had leg edema that was "extensive and unchanged." Tr. 293. She was not taking her medication as prescribed and was "otherwise doing fairly well." Tr. 291. Benton was to return a month later for a follow-up visit, but she didn't return for 2 years. Tr. 293, 333.

In February 2018, Benton went to the emergency room after she fell during a snowstorm. Tr. 291. Benton reported that she hit her face on concrete and complained of a headache radiating down her neck. Tr. 291. A CT scan of

---

[2]    Benton also raised a constitutional challenge, but she later withdrew it. Doc. 12.

[3]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Benton's facial bones and cervical spine showed no evidence of a fracture. Tr. 290. The scan also showed significant disc space narrowing at C5/6 and C6/7 with subchondral sclerosis and marginal osteophytosis, and moderate effacement of the ventral thecal sac. Tr. 472.

In October 2019, Benton went to the emergency room for abdominal pain and left flank pain that she had for the past few weeks before her visit. Tr. 336. A physical exam showed left flank tenderness and leg edema and was otherwise normal. Tr. 336.

In November 2019, Benton saw Andrea VanEstenberg, Ph.D., for a psychological consultative exam. Tr. 307–12. Benton stated that she was applying for disability benefits because of congestive heart failure. Tr. 307. As of that time, she hadn't seen her primary care physician since 2017 and hadn't received any mental health treatment. Tr. 308. Benton stated that she got along well with coworkers and supervisors at her past job. Tr. 308. She reported depressive symptoms of social isolation and withdrawal, decreased motivation and energy, problems with memory and concentration, and anxiety. Tr. 309. Benton's exam findings were normal—a cooperative, pleasant affect; adequate eye contact; and normal speech, thought process, and content. Tr. 309. Benton "tracked the flow of conversation adequately" and did not appear distracted. Tr. 310. She had intact memory, good insight, and adequate judgment. Tr. 310. Dr. VanEstenberg commented that Benton's statements about her symptoms "exceeded observed signs of illness." Tr. 310. Dr.

4

VanEstenberg diagnosed Benton with adjustment disorder with mixed anxiety and depressed mood based on Benton's self-reported mental and physical health issues. Tr. 310. Dr. VanEstenberg stated that Benton did not appear to have limitations performing work-related functions, but Benton would need a solitary setting based on Benton's description of "difficulties with others in regards to social isolation." Tr. 311–12.

In December 2019, Benton returned to Dr. Ravi to re-establish care. Tr. 333. Dr. Ravi wrote, "Apparently [Benton] quit taking medications." Tr. 333. Benton's exam showed lower leg edema that was "somewhat better." Tr. 335. Benton's other physical exam findings were normal. Tr. 334–335. Dr. Ravi assessed Benton with chronic bilateral lower extremity lymphedema, essential hypertension, chronic congestive heart failure, and morbid obesity. Tr. 335. Dr. Ravi restarted Benton's medications. Tr. 335.

Two days later, Benton saw Stephanie Kopey, D.O., for a consultative exam. Tr. 315–24. Benton reported leg swelling and leg pain, rated 10 out of 10, and made worse by walking and navigating stairs. Tr. 319. Benton felt that her activities of daily living were limited from fatigue. Tr. 321. She said that she could sit and stand for 20 minutes, lift only a few pounds, and had difficulty walking. Tr. 320–21. Benton also reported anxiety, sleep disturbances, shortness of breath, wheezing, edema, irregular heartbeat, palpitations, heartburn, nausea, joint pain, stiffness, swelling, and muscle pain and tenderness. Tr. 322.  Upon exam, Benton had elevated blood pressure and she

5

was 5'7" tall and weighed 368 pounds. Tr. 322. Benton had normal cardiac rate and rhythm and unlabored and regular breathing. Tr. 322. She had lymphedema in her lower legs and her distal pedal pulses were rated slightly diminished at 2+. Tr. 322. Benton complained of pain when she moved her legs, and she had an antalgic gait and a visible limp. Tr. 322–23. She could ambulate without an assistive device. Tr. 323. Benton had intact heel and toe walking, no signs of muscle atrophy, and full strength in all major muscle groups of her upper and lower extremities. Tr. 315, 323. Dr. Kopey diagnosed congestive heart failure, obesity, hypertension, hyperlipidemia, and lymphedema. Tr. 323. Dr. Kopey found that Benton could lift and carry up to 20 pounds; sit for up to 8 hours a day; stand and walk for up to 4 hours a day; and should avoid "prolonged or repetitive" climbing and postural maneuvers. Tr. 323.

In February 2020, Benton saw Dr. Ravi and complained of leg swelling, leg pain, and headaches. Tr. 414. Benton tolerated her medications well. Tr. 414. Upon exam, Benton had normal cardiac and pulmonary findings, normal coordination and reflexes, and extensive lymphedema in her lower legs, which were painful and tender. Tr. 416-18. Dr. Ravi ordered lymphedema therapy and continued Benton's medications. Tr. 417.

In April 2020, Benton went to Valley Counseling Services for a psychiatric diagnostic evaluation. Tr. 377. Benton reported anxiety and depressive symptoms. Tr. 377. Mario Laluz, L.P.C., found that Benton had a normal appearance, demeanor, affect, thought content, and cognitive state. Tr.

6

380–81. Benton had a moderately anxious and depressed mood, mildly racing thoughts, agitated motor activity, and clear but pressured speech. Tr. 380–81. She had good insight. Tr. 382. Laluz diagnosed generalized anxiety disorder. Tr. 382. Thereafter, Benton had regular "telehealth" counseling sessions with Luluz.

In late May 2020, Benton saw occupational therapist William Pusser, O.T., for lymphedema. Tr. 391. Benton reported that elevating her legs did not relieve her leg edema. Tr. 391. Her "eating lifestyle" was a trigger. Tr. 391. Benton reported that she had managed her condition by taking "water pill[s]" and wearing "stockings" that she had ordered online. Tr. 392. Benton lived with her daughter in a third-floor apartment with 3 flights of stairs. Tr. 392. Benton said that she "assisted with home management," drove, and was able to perform her activities of daily living independently. Tr. 392–93. Benton rated the severity of her pain as 5 out of 10. Tr. 393. Pusser diagnosed Stage 2 lymphedema. Tr. 394. He prescribed a 6-week course of 2–3 weekly sessions of decongestive therapy using manual lymphatic drainage and massage, compression garment fitting, skilled multilayer bandaging, and instruction on home exercises and other management strategies. Tr. 394.

The record contains notes from only one therapy session a few days after the initial evaluation. Tr. 425. Benton denied pain at that visit. Tr. 425.

In July 2020, Benton visited the emergency department complaining of shortness of breath and swelling in her legs during the 4 days before her visit.

7

Tr. 484. Benton was either "off her Bumex," a diuretic, or not taking it as prescribed. Tr. 484–85. She ambulated without difficulty. Tr. 487. An intravenous diuretic was administered for Benton's leg swelling. Tr. 487. A chest x-ray showed clear lungs and an electrocardiogram showed no abnormalities. Tr. 487. Benton was discharged and advised to see her primary care physician. Tr. 487. Benton's twice-a-day Bumex was restarted, and her failure to take it as prescribed was considered the likely cause of her difficulty breathing. Tr. 487.

In August 2020, Benton saw Dr. Ravi for a follow-up. Tr. 532. Benton told Dr. Ravi that she did not like taking Bumex. Tr. 532. Dr. Ravi adjusted Benton's medications and added Torsemide. Tr. 533, 536.

A month later, Benton saw Dr. Ravi for a follow-up. Tr. 537. Benton reported that she was doing "much better" with Torsemide—it helped her edema and weight loss. Tr. 537. Dr. Ravi's exam notes say that Benton's leg edema was "improving." Tr. 540.

###### 3.   State agency opinions[4]

In January 2020, Leslie Green, M.D., reviewed Benton's record and assessed her physical residual functional capacity (RFC).[5] Dr. Green found that Benton could stand, walk, and sit for about 6 hours in an 8-hour workday and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 81–82. Benton also had postural limitations. Tr. 82. In June 2020, Dana Schultz, M.D., reviewed Benton's record and adopted Dr. Green's findings. Tr. 115–16.

In December 2019, Courtney Zeune, Psy.D., reviewed Benton's record and found that Benton did not have a severe mental impairment. Tr. 79. In May 2020, Bonnie Katz, Ph.D., reviewed Benton's records and agreed with Dr. Zeune's findings. Tr. 105.

###### 4.   Hearing testimony

Benton, who was represented by counsel, testified at the telephonic administrative hearing held in November 2020. Benton lives in an apartment

---

[4]      When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]      An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

with her adult daughter. Tr. 49–50. Benton has a driver's license and is able to drive. Tr. 50. She doesn't have a handicap placard in her car. Tr. 50.

When asked why she is unable to work, Benton answered that she has severe swelling and pitted edema in her legs, especially her right leg. Tr. 55. She has congestive heart failure and it's hard for her to navigate stairs or even walk down a hallway. Tr. 55. Benton is typically out of breath. Tr. 55. She can't stand for more than 5 minutes and it's hard to sit for a long time and hard to stand. Tr. 55. Benton's legs hurt constantly. Tr. 55. "Even with short stretch bandaging, even with all the therapy, my legs constantly throb and it makes me hobble." Tr. 55. Benton has fallen several times. Tr. 55.

When asked if her lymphedema therapy helped, Benton answered, "Somewhat," and explained that she needs more therapy. Tr. 56. As soon as the bandages are removed from her legs, her legs swell back up again. Tr. 56. It was recommended that Benton elevate her legs, and that helps with the swelling as long as her legs are elevated above her heart. Tr. 56. "I'm really in bed all day." Tr. 56. As soon as she stands up, her legs start swelling and it's hard to walk. Tr. 56. Benton stated that, during the hearing, she was sitting up in bed with pillows under her legs. Tr. 56. Benton estimated that she spent about 70% of the day in bed. Tr. 56. When she's not in bed she "will make it to the living room" and sit in her recliner with her legs elevated above her heart. Tr. 56. Elevating her legs does not eliminate the swelling, but it reduces it. Tr.

10

57. It makes it bearable to get up and walk to the bathroom. Tr. 57. She needs help showering, and, some days, going to the restroom. Tr. 57.

Benton takes "water pills." Tr. 57. The pills drop her heartrate, which makes her feel dizzy, and her blood pressure, which makes her feel nauseas. Tr. 57. So Benton is nauseated every day. Tr. 57. Also, the pills make her urinate; one pill lasts 4 hours and it makes her urinate about 10 times an hour. Tr. 57.

When asked what limitations she has from her congestive heart failure, Benton stated that she is out of breath. Tr. 58. Benton lives in a third-floor apartment and when she goes downstairs, she has to wait at least 30 minutes before she can go upstairs again because she will be completely out of breath. Tr. 58. If she goes too fast, she'll faint. Tr. 58. She recently bought a cane because she kept stumbling. Tr. 59. Benton fell 3 times during the first 2 weeks of August 2020. Tr. 59. She is morbidly obese. Tr. 59. Her legs are so heavy that she can't wear pants anymore, so she wears dresses. Tr. 58–59.

When asked to describe how her depression and anxiety affected her ability to work, Benton stated that she felt bullied by her co-workers because she was often out of breath and her right leg was so big. Tr. 60. She felt like she wasn't doing a good job as a nurse's aide. Tr. 60. Every time Benton went to see her doctor, the doctor would tell her that she had to go on leave because her congestive heart failure was "acting up." Tr. 60. Benton then became a lab clerk, which she seemed to do "very well," but then her congestive heart failure

11

started "acting up" again. Tr. 61. Also, she has anxiety—"I have a thing about going outside now because I'm kind of scared." Tr. 61. Benton has anxiety about going down her apartment stairs because she's afraid to fall. Tr. 61–62. She won't leave home unless someone is with her and she prefers not to drive because she has to use her right leg. Tr. 62.

The ALJ discussed with the vocational expert Benton's past relevant work as a lab report clerk and a nurse aide. Tr. 64. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Benton could perform Benton's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 64–65. The vocational expert answered that such an individual could perform Benton's past work and the following jobs: cashier, router, and sub-assembler. Tr. 65–67. The ALJ asked the vocational expert if the vocational expert's answer would change if the hypothetical individual needed to elevate her legs throughout the day. Tr. 68. The vocational expert stated that such an individual could not perform competitive employment. Tr. 68.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.  The claimant has not engaged in substantial gainful activity since August 23, 2018, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

12

3.   The claimant had the following severe impairments: chronic congestive heart failure (CHF), chronic lymphedema of the bilateral lower extremities, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b) and including the exertional abilities to lift and/or carry (including upward pulling) up to 20 pounds occasionally and 10 pounds frequently, to push and/or pull (including operation of hand and/or foot controls) unlimited other than as shown for lift and/or carry, and to sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, except that she can stand and/or walk (with normal breaks) for a total of 4 hours in an 8-hour workday and is further limited in the following nonexertional respects: Can never climb ladders, ropes, or scaffolds but can occasionally climb ramp and stairs, can frequently balance, and can occasionally stoop, kneel, crouch, and crawl.

6.  The claimant is capable of performing past relevant work as a Laboratory Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). Therefore, the undersigned makes the following alternative findings for step five of the sequential evaluation process:…

7.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

Tr. 15–36.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

14

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

15

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1. The ALJ did not err at step 2* [6]

Benton argues that the ALJ erred at step 2 when she found that Benton's mental impairments were not severe. Doc. 10, at 14. Benton asserts that "the combination of [Benton's] symptoms were of such severity that it was recommended that she maintain bi-weekly treatment levels." *Id.* But the fact that a counselor recommended bi-weekly counseling sessions does not compel a finding that Benton's mental impairments were severe. The ALJ spent almost 4 pages discussing Benton's mental impairments and explaining why

---

[6] Benton's heading identifies an RFC challenge, but it includes a step 2 argument. Benton's counsel has been previously warned to refrain from combining disparate challenges and arguments of the sequential disability evaluation together. *See, e.g.*, Case No. 1:21-cv-00556, Doc. No. 19, p. 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, p. 34, n. 5 (filed 2/2/2022); see also Case No. 5:20-cv-01340, Doc. No. 21, p. 26, n. 9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. No. 21, p. 25, n. 8 (filed 8/16/2021); Case No. 1:21-cv-2062, Doc. 13, p. 25, n.9 (filed 10/11/2022). Going forward, if counsel continues to present arguments in this manner, the Court may deem an argument waived or impose other appropriate sanctions.

they were "not severe." Tr. 19-23. The ALJ detailed Benton's bi-weekly counseling notes. Tr. 21. The only argument Benton articulates is that the ALJ relied on the state agency reviewers' opinions when those reviewers didn't have the benefit of the subsequent counseling notes from Valley Counseling.[7] Doc. 10, at 15. But the ALJ considered those Valley Counseling notes and the fact that the state agency reviewers' opinions predated those records.[8] Tr. 21. So the ALJ's reliance upon the state agency reviewers' opinions was not reversible error. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (An ALJ may rely on state agency reviewers' opinions when those reviewers did not review the entire record, as long as the ALJ acknowledges that fact) (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

---

[7]     Benton's brief contains generic statements like, "The evidence documented that Benton had severe psychological impairments. Impairments which were erroneously neither considered nor included in the RFC. Basing her erroneous finding that Benton did not have any psychological severe impairments, therefore, was in error and was not supported by substantial evidence necessitating a remand of this matter." Doc. 10, at 14. Those statements do not identify a specific error that the ALJ made. So those purported arguments are waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to...put flesh on its bones.") (internal citations omitted).

[8]     The ALJ accurately stated that, on reconsideration, Dr. Katz reviewed Benton's intake evaluation at Valley Counseling. Tr. 22.

2. *The ALJ did not err when evaluating Benton's obesity*

Benton cites Social Security Ruling 19-2p, "Evaluating cases involving obesity," and concedes that the ALJ considered that ruling. Doc. 10, at 15. Benton submits that an ALJ isn't required to adopt any particular method of analysis when evaluating obesity but is required to consider obesity in combination with other impairments. *Id.* at 15–16. Benton writes that the ALJ commented that one treatment note—an emergency room visit from July 2020—linked Benton's obesity to her shortness of breath that day. *Id.* at 16. Benton states, "Since there was medical evidence linking these impairments, failing to consider the combination of her obesity and other impairments constituted harmful and reversible error in this matter." *Id.* But the ALJ evaluated the combination of Benton's obesity and other impairments and discussed the July 2020 treatment note. Tr. 23, 29. Benton has not described an error by the ALJ. Benton's argument that the ALJ erred when considering her obesity fails.

3. *The ALJ did not err when she evaluated Benton's symptoms*

Next, Benton argues that the ALJ erred when she evaluated Benton's reports of symptoms. Doc. 10, at 16. Benton complains that the ALJ "erroneously failed to include any related limitations or link the pain and swelling related to lymphedema in the RFC." *Id.* at 17.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's

18

statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2016 WL 1119029, at *4 (March 16, 2016); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

Here, the ALJ provided an exhaustive explanation of how she arrived at her RFC assessment. Tr. 25–33. Benton's assertion that the ALJ "failed to include any related limitations or link the pain and swelling to lymphedema in the RFC" is wrong—the ALJ spent almost 9 pages discussing Benton's reports of symptoms, Tr. 25–33, including pain and swelling, and the ALJ explained what limitations she assessed to accommodate Benton's leg swelling, Tr. 29.

Benton objects (Doc. 10, at 17) to this paragraph the ALJ wrote:

> Although the claimant has described daily activities that are fairly limited, two general factors weigh against considering these allegations to be strong evidence in favor of any greater physical or other functional limitations beyond the reduced range of light work set forth above. First,

19

allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to her medical conditions, as opposed to other reasons, in view of the foregoing medical factors that include limited compliance with taking prescribed medications for the lymphedema. Additionally, her May 2020 statements about daily activities to the occupational therapist reflect independence in home management, bathing and dressing, toileting, grooming, and other daily activities (Ex. 6F/8,9). For these reasons, except insofar as consistent with the reduced standing and walking time in a workday, occasional performance of most postural body movements, and light lifting and carrying ability, the claimant's reported limitations in and need for assistance from others in doing many daily activities are considered to be outweighed by the other factors discussed above.

Tr. 30–31. Benton argues that this paragraph "failed to properly detail Benton's testimony and make a defensible determination as to whether her testimony was consistent with her treatment and symptoms." Doc. 10, at 17. But before this paragraph, the ALJ discussed Benton's repeated non-compliance with treatment, Benton's gaps in treatment (a 2-year gap and a 6-month gap), Benton's recent improvement on a new medication, and the fact that Benton's extreme statements about needing help showering and going to the restroom were not supported by the record, which showed that Benton told her providers that she was independent with all of her activities of daily living. Tr. 25–33.

Benton's additional arguments are unavailing. She complains that the ALJ's statement—"The record contains one, but only one, documented [occupational] therapy session after that late May 2020 evaluation"—is wrong. Doc. 10, at 17. But it's not wrong. The record documents an initial evaluation

on May 28, 2020, and one session on June 1, 2020. Tr. 28, 388, 391. Benton identifies a printout showing various items of Benton's medical chart, including a "Last 4 Visits" column that shows she arrived for a therapy session on June 3, 2020. Tr. 399. But there is no treatment note from that purported session. So it's accurate to say that there is only one documented therapy session after Benton's initial evaluation. And Benton does not object to the ALJ's finding that the record shows that she did not "consistently attend[]" therapy. Tr. 28.

Benton argues that the ALJ failed to mention that one of her gaps in treatment with Dr. Ravi, from February to August 2020, was "during the time of shut[-]downs due to COVID." Doc. 10, at 17. But Benton visited other providers during that time, so Benton does not show that she was *prevented* from seeing Dr. Ravi. Benton's additional boilerplate language and case citations, Doc. 10, at 18–19, do not articulate a specific argument and are waived. *See McPherson*, 125 F.3d at 995–96.

4.    *The ALJ did not err as to whether Benton needs to elevate her legs*

Benton disagrees with the ALJ's finding that Benton did not need a work restriction permitting her to elevate her legs while sitting. Doc. 10, at 21; Doc. 13, at 2. The ALJ explained,

The alleged need to elevate the legs is not documented by a medical source other than the occupational therapist, but he noted that this does not relieve the symptom at a time when she had not been compliant with taking the medications. The first instance of seeking non-medication therapy in May/June 2020 combines with the noncompliance with taking the medications and, when considered in context with the "much

21

> better" swelling reported one month into taking a new medication at the
> September 2020 follow-up visit, are factors that simply do not support
> the alleged need to elevate the legs as the only way to reduce or
> otherwise control the swelling. Were the swelling to have been as
> intense and persistent as alleged in connection with these applications,
> the undersigned would expect to see more consistent and repeated
> efforts made over the recently past year than the three total office visits
> (and one telephone call in March 2020) to Dr. Ravi, more documentation
> relating to the decongestive therapy sessions.

Tr. 29–30. Benton writes, "Contrary to the ALJ's contention, the record contained additional evidence which supported the fact that Benton needed to elevate her legs to reduce swelling." Doc. 10, at 21. But Benton only cites her own statements at the hearing and in her function report. *Id*. Benton's statements are not "medical evidence." So she has not shown that the ALJ's statement was erroneous.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: November 28, 2022

          */s/ James E. Grimes Jr.*
          James E. Grimes Jr.
          U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).